**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------- X

SCANDINAVIAN REINSURANCE
COMPANY LIMITED,

           **Petitioner,**

      **- against -**

ST. PAUL FIRE & MARINE
INSURANCE CO., ST. PAUL
REINSURANCE CO., LTD., and ST.
PAUL RE (BERMUDA) LTD.,

          **Respondents.**

----------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 9531 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/23/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Scandinavian Reinsurance Company Limited ("Scandinavian Re")

petitions the Court to vacate a final award (the "Petition") from an arbitration that

occurred between Scandinavian Re and St. Paul Fire & Marine Insurance

Company, St. Paul Reinsurance Company, Ltd. and St. Paul Re (Bermuda) Ltd.

(collectively, "St. Paul" or "Respondents") (the "Scandinavian Re Arbitration").

Scandinavian Re contends that two of the arbitrators exhibited evident partiality

by failing to disclose their simultaneous involvement in an arbitration between

1

Platinum Underwriters Bermuda, Ltd. ("Platinum Bda") and PMA Capital

Insurance Company ("PMA") (the "Platinum Bda Arbitration") that involved "a

common witness, similar disputed issues and contract terms, and the company that

succeeded to the business of St. Paul."[1]  St. Paul cross-petitions to confirm the

arbitration award.  For the reasons discussed below, Scandinavian Re's Petition is

granted and St. Paul's cross-petition is denied.

## II.   BACKGROUND

### A.   The Underlying Reinsurance Dispute Between Scandinavian Re and St. Paul

On or about August 21, 1999, Scandinavian Re and St. Paul entered

into a Retrocessional Casualty Stop Loss Agreement (the "Scandinavian Re

Agreement") under which St. Paul ceded a portion of its casualty reinsurance

portfolio to Scandinavian Re.[2]  The Scandinavian Re Agreement was a finite

---

[1]     Amended Petition to Vacate Arbitration Award at 2.

[2]     *See* Retrocessional Casualty Aggregate Stop Loss Agreement ("Scandinavian Re Agreement"), Ex. 1 to Declaration of Mitchell Hurley, Scandinavian Re's Counsel ("Hurley Decl.").

        Reinsurance is insurance for insurance companies — the ceding company transfers or "cedes" all or part of the risk it underwrites to the reinsurer — another insurance company that is willing to assume that risk. *See Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049, 1053 (2d Cir. 1993).  In a retrocessional agreement, a reinsurer cedes a portion of its risk to another reinsurerer.  A retrocessional agreement is effectively reinsurance for reinsurance. *See* Petitioner's Amended Memorandum of Law in Support of Petition to Vacate

2

retrocessional agreement — meaning that the amount of risk transferred from St. Paul to Scandinavian Re was limited.[3] The Scandinavian Re Agreement contained an arbitration provision whereby the parties agreed that "any dispute arising out of the interpretation, performance, or breach of [the Scandinavian Re] Agreement . . . [would] be submitted for decision to a panel of three arbitrators."[4] The arbitrators were required to be "disinterested."[5]

Eventually, disputes regarding the Scandinavian Re Agreement arose. Broadly, the disputes involved (1) whether a cap on Scandinavian Re's liability should be read into the Scandinavian Re Agreement because the parties intended to pass only a limited amount of risk to Scandinavian Re or alternatively, whether the Scandinavian Re Agreement should be rescinded because St. Paul misrepresented the amount of liability Scandinavian Re faced under the Scandinavian Re Agreement and; (2) whether the Scandinavian Re Agreement created one experience account[6] that applied to the entire term of the Scandinavian

---

Arbitration Award ("Pet. Mem.") at 2 n.1.

[3]     *See* Pet. Mem. at 2 n.1.

[4]     Scandinavian Re Agreement at 11.

[5]     *Id.*

[6]     An experience account is an account that holds premiums owed to the reinsurer as well as the interest the ceding company credits onto the account's

Re Agreement or separate experience accounts for each year covered by the Scandinavian Re Agreement.[7]

### B.     The Scandinavian Re/St. Paul Arbitration

#### 1.     Selection of the Arbitrators

On September 26, 2007, St. Paul demanded arbitration.[8]  Under the Scandinavian Re Agreement, each party was to appoint an arbitrator and the two party-appointed arbitrators would appoint a neutral umpire.[9]  Scandinavian appointed Jonathan Rosen and St. Paul appointed Peter Gentile.[10]  Rosen and Gentile selected Paul Dassenko to be the umpire and Scandinavian Re and St. Paul

---

balance.  *See* Pet. Mem. at 3.  Such accounts are useful to reinsure losses that develop over many years because the experience account's funds are used to pay any claims that develop and the reinsurer is not required to pay any of its own funds until the experience account is depleted.  *See id.*

[7]      *See* Scandinavian Reinsurance Company's Position Statement at 12-15; Ex. 2 to Hurley Decl.

[8]      *See* 9/26/07 Letter from David M. Raim, Counsel for St. Paul, to Mark G. Kaplan, President and CEO of Scandinavian Re, Ex. 3 to Hurley Decl.

[9]      *See* Scandinavian Re Agreement at 11.

[10]     *See* Pet. Mem. at 4; Memorandum of Law in Support of Respondents' Opposition to Petitioner's Petition to Vacate Arbitration Award and Respondents' Cross-Petition to Confirm Arbitration Award ("Opp. Mem.") at 3.

accepted his appointment on November 29, 2007.[11]

Although the Scandinavian Re Agreement did not require empaneling

arbitrators certified by the AIDA Reinsurance and Insurance Arbitration Society

("ARIAS"),[12] all three arbitrators were ARIAS certified.[13]  ARIAS certified

arbitrators are required to "abide by and be subject to the ARIAS-US guidelines

for arbitrator conduct."[14]  The guidelines require arbitrators to "disclose any

interest or relationship likely to affect their judgement" and resolve all doubts in

favor of disclosure.[15]  The ARIAS disclosure requirements specifically state:

> 1. Before accepting an arbitration appointment, candidates
> should make a reasonable effort to identify and disclose
> any direct or indirect financial or personal interest in the
> outcome of the proceeding or any existing or past financial,
> business, professional, family or social relationship that

---

[11]     *See* Pet. Mem. at 4; Opp. Mem. at 3; 1/22/10 Declaration of Barry A.
Chasnoff, Scandinavian Re's Counsel ("Chasnoff Decl.") ¶ 4.

[12]     ARIAS "is a not-for-profit corporation that promotes improvement of
the insurance and reinsurance arbitration process for the international and
domestic markets."  Excerpts from www.arias-us.org ("ARIAS Excerpts"), Ex. 4
to Hurley Decl. ARIAS "certifies a pool of qualified arbitrators and serves as a
resource for parties to find appropriate persons to resolve disputes in a
professional, knowledgeable, and cost-effective manner." *Id.*

[13]     *See* ARIAS biographies of Rosen, Gentile, and Dassenko, Ex. 5 to
Hurley Decl.

[14]     ARIAS Arbitrator Application, Ex. 4 to Hurley Decl.

[15]     ARIAS Excerpts.

5

others could reasonably believe would be likely to affect
their judgment, including any relationship with persons
they are told will be potential witnesses.

. . .

3. The duty to disclose all past and present interests is a
continuing obligation throughout the proceeding. If any
previously undisclosed interests or relationships described
in Comment 1 are recalled or arise during the course of the
arbitration, they should be disclosed immediately to all
parties and the other arbitrators.[16]

## 2.    The Arbitrators' Disclosures

Prior to his appointment, Dassenko completed a jointly submitted

questionnaire"[t]o help the parties evaluate the qualifications of umpire

nominees . . . and to identify any potential conflicts of interest."[17] The umpire

questionnaire listed many companies affiliated with both Scandinavian Re and St.

Paul.[18] Neither Platinum Underwriters Holdings Ltd. ("Platinum Holdings") nor

its wholly-owned subsidiary company Platinum Bda (collectively "Platinum") was

listed.[19] The questionnaire asked about Dassenko's present and prior involvement

---

[16]     *Id.*

[17]     Umpire Questionnaire Completed by Paul Dassenko ("Umpire
Questionnaire"); Ex. 6 to Hurley Decl.

[18]     *See id.*

[19]     *See id. See also infra* Part 2.D. (describing the relationship between
St. Paul and Platinum).

6

with Scandinavian Re, St. Paul, the listed companies, the specific claims at issue, and the Scandinavian Re Agreement.[20]  The questionnaire also asked whether Dassenko had "ever served as an arbitrator, umpire, attorney, or expert witness in a matter involving any of the parties listed above or any subsidiaries, affiliates or parent companies of such parties."[21]

In response to the questionnaire, Dassenko made disclosures regarding relationships with companies affiliated with both Scandinavian Re and St. Paul.[22]  Dassenko additionally disclosed that he was currently serving as arbitrator in a matter where he had been appointed by a party adverse to a Scandinavian Re affiliate and where Rosen was the umpire.[23]  Dassenko further disclosed that he had once before served on an arbitration panel with Rosen.[24] Dassenko did not mention working with Gentile on any arbitration nor did he disclose any relationship with Platinum.[25]

---

[20]    *See* Umpire Questionnaire.

[21]    *Id.*

[22]    *See id.*

[23]    *See id.*

[24]    *See id.*

[25]    *See id.*

7

On February 25, 2008, an organizational meeting was held where Scandinavian Re and St. Paul had an opportunity to further question Dassenko about the disclosures in his umpire questionnaire.[26]  Rosen and Gentile also made disclosures regarding their involvements with Scandinavian Re, St. Paul, counsel for both parties, and the other arbitrators.[27]  After the disclosures, Dassenko assured the parties that "[a]ll three of us [arbitrators] acknowledge disclosure is an ongoing responsibility, and as we become aware of relationships or situations that require additional disclosure, we represent that we will undertake this at the earliest opportunity to the parties to this matter."[28]

Throughout the arbitration, the arbitrators made a variety of additional disclosures.[29]  Several of those disclosures involved Dassenko and

---

[26]   *See* 2/25/08 Transcript of Organizational Meeting ("Org. Mtg. Tr.") at 5:3-17, Ex. 8 to Hurley Decl.

[27]   *See id.* at 5:20-14:15.

[28]   *Id.* at 15:9-16.

[29]   *See, e.g.*, 7/18/08 Oral Argument Transcript at 196:19-199:19, Ex. 9 to Hurley Decl.; 5/2/09 Oral Argument Transcript ("5/2/09 Tr.") at 4:17-9:2, Ex. 10 to Hurley Decl.; Excerpts from the Scandinavian Re Arbitration Transcript ("Scandinavian Re Arb. Tr.") at 1936:5-17, 2054:18-2056:11, Ex. 11 to Hurley Decl.; Summary of Arbitrator Disclosures ("Summary of Arb. Discl."), Ex. 9 to Declaration of John F. Finnegan, Counsel for St. Paul ("Finnegan Decl.").

Gentile's relationships with witnesses.[30]  Additionally, Dassenko reaffirmed his

belief that "it's important to make as full disclosure as possible." and, Gentile

acknowledged that he had a "responsibility to disclose potential conflicts on an

ongoing basis."[31]

      At no time did Dassenko or Gentile disclose that, after being

empaneled as arbitrators in the Scandinavian Re Arbitration, they were both

chosen to be arbitrators in the Platinum Bda Arbitration.[32]  Nor did they disclose

that a witness in the Scandinavian Re Arbitration, Bart Hedges,[33] was also a

witness in the Platinum Bda Arbitration.[34]  Scandinavian Re did not learn that

Dassenko and Gentile served together on the Platinum Bda Arbitration until

---

[30]    *See, e.g.*, Scandinavian Re Arb. Tr. at 3604:6-3605:14, 2149:12-2150:20; 5/2/09 Tr. at 4:17-7:7.

[31]    Scandinavian Re Arb. Tr. at 2112:4-9, 3605:17-18.

[32]    *See infra* Part II.C.

[33]    Hedges worked for Scandinavian Re at the time it entered into the Scandinavian Re Agreement. *See* Pet. Mem. at 6.  Hedges was responsible for analyzing data that St. Paul submitted to Scandinavian Re during the underwriting process. *See id.*  Hedges went on to become President and CEO of Scandinavian Re before becoming an executive at Platinum. *See id.*

[34]    *See id.*; Summary of Arb. Discl.

9

October 22, 2009.[35]  Scandinavian Re states that if Dassenko or Gentile had

disclosed their connection with the Platinum Bda Arbitration, Scandinavian Re

would have objected to their continued service in the Scandinavian Re Arbitration

and sought their recusal if they refused to voluntarily resign.[36]

### 3.    The Arbitration Proceedings

After discovery, depositions, and briefing, an evidentiary hearing was

held in New York from June 14, 2009 through July 2, 2009.[37]  Hedges testified via

video conference on June 23, 2009.[38]  Both Scandinavian Re and St. Paul included

Hedges on their preliminary witness lists, submitted on March 27, 2009, and their

final witness lists, disclosed on June 2, 2009.[39]  During Hedges's testimony,

---

[35]    *See* Affidavit of Christine Hayer Repasy, General Counsel of White
Mountains Re Services, affiliate of Scandinavian Re ¶ 4.

[36]    *See id.* ¶ 5.

[37]    *See* Affidavit of David M. Raim in Support of Respondents and
Cross-Petitioners' Petition to Confirm Arbitration Award ("Raim Aff.") ¶ 5; Final
Arbitration Award ("Award") at 1, Ex. 14 to Hurley Decl.

[38]    *See* 6/23/09 Transcript of Hedges' Testimony ("Hedges Tr."), Ex. 14
to Finnegan Decl.

[39]    *See* 3/27/09 Email from David Nelson, Scandinavian Re's Counsel ,
to Raim, Finnegan, and Joy Langford, St. Paul's Counsel , Ex. 15 to Hurley Decl.;
3/27/09 Email from Finnegan to Rick Rosenblum, Scandinavian Re's Counsel;
6/2/09 Email from Finnegan to Dassenko, Rosen, and Gentile ("6/2/09 Finnegan
Email") (attaching a calendar reflecting the order of witnesses and a chart
estimating the length of examination for each witness).

10

Gentile greeted Hedges by stating, "we have met a few times in the past, mainly in

Bermuda, so I say hello to you again."[40]  During his testimony, Hedges stated that

Scandinavian Re "would never have entered" the Scandinavian Re Agreement if it

had been made aware of the amount of liability it could potentially face.[41]

On August 19, 2009, the arbitrators issued a written award ("The

Scandinavian Re Award").[42]  The Scandinavian Re Award states:

> [a] *majority of* the Panel finds that the [Agreement]
> between St. Paul and [Scandinavian Re] is valid and
> enforceable and shall be applied based on the written terms
> of that Agreement; all of [Scandinavian Re's] objections to
> the validity of the [Scandinavian Re Agreement] and the
> performance thereof, including but not limited to
> [Scandinavian Re's] claims for rescission, reformation,
> other equitable relief and damages are accordingly
> denied.[43]

The Scandinavian Re Award further states that "[t]he Panel finds that the

[Scandinavian Re Agreement] provides for separate Experience Accounts for each

underwriting year covered by the [Scandinavian Re Agreement] and rules that the

---

[40]     Hedges Tr. at 1832:12-15, Ex. 14 to Finnegan Decl.

[41]     *See id.* at 1657:13-1658:4, Ex. 23 to Chasnoff Decl.

[42]     *See* Raim Aff. ¶ 5; Pet. Mem. at 1.

[43]     Scandinavian Re Award at 1 (emphasis added).  The award does not
indicate which arbitrators were in the majoritys.  However, St. Paul never disputes
that Gentile and Dassenko formed the majority and Rosen dissented.

experience accounts should be administered and applied in the manner set forth by St. Paul at the hearing."[44]

## C. The Platinum Bda/PMA Arbitration

In 2003, PMA and Platinum Bda entered into a finite retrocessional agreement under which PMA ceded certain insurance risks to Platinum Bda (the "Platinum Bda Agreement").[45] Hedges appears to have negotiated and signed the Platinum Bda Agreement on behalf of Platinum Bda.[46] On June 2, 2008, Platinum demanded arbitration to resolve a dispute concerning the validity and scope of the Deficit Carry Forward Provision contained in the Platinum Bda Agreement.[47] Specifically, Platinum Bda sought "a declaration that, in the calculation of the balance of the Experience Account under Article 15 of the [Platinum Bda Agreement], Platinum [Bda] is entitled to the benefit of the deficit carry forward

---

[44]     *Id.*

[45]     *See PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp 2d 631, 632 (E.D. Pa 2009).

[46]     *See* Cover Page and Signature Page of the Platinum Bda Agreement, Ex. 21 to Chasnoff Decl.; 5/20/09 Transcript of Closing Arguments in Platinum Bda Arbitration at 453:17-19, Ex. 22 to Chasnoff Decl.

[47]     *See PMA Capital Ins. Co.*, 659 F. Supp. 2d at 634. "A 'deficit carry forward provision' allows the reinsurer to carry forward any loss it may have incurred in one year to the next year, when the reinsurer can apply funds from that year's experience account (assuming it has a positive balance) to offset the first year loss." *Id.* at 633.

12

from PMA's 1999-2001 contract with St. Paul Re."[48]  Platinum Bda and PMA also

disputed whether the Platinum Bda Agreement created one experience account or

three separate annual experience accounts.[49]  Platinum Bda appointed Gentile as

its party-arbitrator and Dassenko was chosen as the umpire.[50]  David Thrillkill

served as PMA's party-appointed arbitrator.[51]

On September 23, 2008, Platinum Bda, PMA and the arbitrators held

an organizational meeting at which the arbitrators disclosed their potential

conflicts of interest.[52]  Among other things, Dassenko disclosed that he was

currently serving as an arbitrator with Gentile on another "matter where [he] was

---

[48]     *Id*. at 634 (quotation marks and alterations omitted).  PMA purchased
reinsurance from St. Paul Re for the coverage period between 1999 and 2001.  *See
id*. at 633.  St. Paul Re was "a management company that wrote assumed
reinsurance using the paper of The St. Paul Fire and Marine Insurance Company
and its affiliates."  Affidavit of Ronald H. Smillie, Vice President of Travelers
Special Services, Affiliate of St. Paul ("Smillie Aff.") ¶ 1.  In 2002, St. Paul's
consolidated operations contributed substantially all of its reinsurance business to
Platinum Holdings' consolidated operations.  *See infra* Part 2.D.

[49]     *See* 3/31/09 Platinum Bda Arbitration Transcript at 540:20-541:23;
542:17-543:20, Ex. 12 to Hurley Decl.

[50]     *See id.* at 3:24-4:3

[51]     *See* 9/23/08 Transcript of Platinum Bda Organizational Meeting
("Platinum Bda Org. Mtg. Tr.") at 3:18-20, Ex. 16 to Chasnoff Decl.

[52]     *See id.* at 4:9-17.

13

appointed in December of 2007."[53]  The matter that Dassenko referred to was the

Scandinavian Re Arbitration.  However, Dassenko never stated that Scandinavian

Re or St. Paul were involved in that arbitration.  During Gentile's disclosures

Gentile acknowledged that he and Dassenko "currently serve on one arbitration

panel together.  [Dassenko] is the umpire.  This is ongoing, and a hearing is

scheduled for May of '09."[54]  Gentile was also referring to the Scandinavian Re

Arbitration.  During his disclosures, Gentile additionally stated "[w]ith respect to

the parties, PMA, Platinum and Platinum's predecessor, St. Paul Re, this is the

first matter that I will be serving on an arbitration on."[55]  Neither Gentile nor

Dassenko clarified that St. Paul entities were parties in their mutual concurrent

arbitration.

        The parties met with the Arbitrators in Philadelphia on March 31,

---

[53]     *Id.* at 5:11-17.

[54]     *Id.* at 9:19-10:1.  At the time of the Platinum Bda Arbitration's
organizational meeting, the final hearing in the Scandinavian Re Arbitration was
scheduled for May 2009.  *See* Chasnoff Decl. at ¶ 5.

[55]     Platinum Bda Org. Mtg. Tr. at 8:19-23.  It is unclear from Gentile's
reference to "St. Paul Re" whether he is referring to St. Paul Re or St. Paul's
parent company's, The St. Paul Companies, consolidated operations.  Because St.
Paul Re was a management company, not an insurance or reinsurance company, it
was not the corporate predecessor of any Platinum entity.  However, St. Paul Re
wrote the contract that predated Platinum Bda's contract with PMA.

14

2009, April 1, 2009, and May 20, 2009 to present evidence, testimony, and legal

argument.[56]  Hedges's videotaped deposition was presented on March 31, 2009.[57]

Platinum's counsel used Hedges's testimony to argue that the Platinum Bda

Agreement should be enforced as written.[58]  On May 22, 2009, the arbitrators

issued an award (the "Platinum Bda Award") finding, *inter alia*, that all references

to a deficit carry forward provision in the Platinum Bda Agreement would be

"'removed from the contract.'"[59]  On June 3, 2009, PMA filed a petition to vacate,

or in the alternative to modify, the Platinum Bda Award arguing that the

arbitrators' decision was "impermissibly contrary to both the relief sought by the

Parties and the plain language of the [Platinum Bda Agreement]."[60]  On September

17, 2009, Judge Paul S. Diamond of the Eastern District of Pennsylvania vacated

---

[56]     *See PMA Capital Ins. Co.*, 659 F. Supp. 2d at 634.

[57]     *See* 3/31/09 Platinum Bda Arbitration Transcript at 18:4-22, Ex. 6 to Finnegan Decl.

[58]     5/20/09 Platinum Bda Arbitration Transcript at 519:8-520:2, Ex. 22 to Chasnoff Decl. (arguing that a mistake made by PMA "left Mr. Hedges under the well-founded understanding that the contract meant what it said, that he had agreed, and PMA had agreed . . . to a deficit carryforward . . . and the panel should enforce the contract as it is written and vindicate Mr. Hedges'[s] perfectly legitimate expectations of this contract.").

[59]     *PMA Capital Ins. Co.*, 659 F. Supp. 2d at 634 (quoting the Platinum/PMA Final Arbitration Award).

[60]     *Id.*

15

the Platinum Bda Award on the grounds that it could not be rationally derived

from the parties' submissions and it was "completely irrational."[61]

### D. The Relationship Between St. Paul and Platinum Bda

The parties disagree about the extent of the relationship between St.

Paul and Platinum. Scandinavian Re characterizes Platinum Bda as St. Paul's

"successor entity" and asserts that in 2002, The St. Paul Companies "created

Platinum and then sold shares to the public in an [initial public offering

("IPO")]."[62] Scandinavian Re points to the Platinum Holdings Form S-1

Registration Statement, which indicates that The St. Paul Companies and its

subsidiaries agreed to contribute "substantially all of its continuing reinsurance

business and assets relating thereto" to Platinum Holdings' consolidated

operations.[63] Platinum Holdings' consolidated operations included Platinum Bda,

and Platinum Regency Holdings, a wholly owned intermediate holding subsidiary,

which owned Platinum Underwriters Reinsurance, Inc. ("Platinum US") and

---

[61]     *Id.* at 637-40.

[62]     Pet. Mem. at 6-7.

[63]     Excerpt from 4/24/02 Platinum Underwriters Holdings, Ltd. Form S-1
("S-1 Excerpts") at 2, Ex. 13 to Hurley Decl. *See also* 4/24/02 Platinum
Underwriters Holdings, Ltd Form S-1, *available at*
http://phx.corporate-ir.net/phoenix.zhtml?c=131693&p=irol-sec&secCat01.1_rs=5
91&secCat01.1_rc=10.

16

Platinum Re (UK) Limited.[64]

St. Paul contends that Platinum Bda "does not now, nor has it ever, shared any corporate interrelatedness with St. Paul."[65]  In support of this contention, St. Paul submits the affidavit of Ronald H. Smillie, Vice-President of Travelers Special Services.[66]  Smillie states that based on his knowledge of the industry and his review of SEC filings, his "understanding" is that "St. Paul has not had any corporate interrelationships with Platinum Bda," although The St. Paul Companies, of which St. Paul was a part, Travelers Companies Inc. ("Travelers"), and Travelers Special Services "had dealings and/or a relationship with Platinum US and Platinum Holdings."[67]

Scandinavian Re alleges that St. Paul "administers [the] agreement [under which St. Paul contributed its reinsurance business and assets to Platinum Holdings' consolidated operations] and receives several hundred thousand dollars

---

[64]    *See* S-1 Excerpts at 3.

[65]    Opp. Mem. at 17.

[66]    All the Respondents are or were subsidiaries of Travelers Companies Inc. which now owns The St. Paul Companies.  *See* Smillie Aff. ¶ 1.

[67]    *See id.* ¶ 4.

in fees annually from Platinum."[68]  St. Paul admits that Travelers Special Services

receives approximately $300,000 "to administer claims and to provide actuarial

and administrative services," but claims that these fees are for business ceded by

St. Paul to Platinum US.[69]  The parties agree that Travelers currently holds a

financial stake in Platinum.[70]  However, St. Paul explains that since January 10,

2005 Travelers has only held options to acquire 702,140 shares of Platinum

Holdings' common stock.[71]  If Travelers exercised all its options, it would own

approximately 1.3% of Platinum Holdings' common stock.[72]  The parties also

agree that following Platinum Holdings' IPO, approximately 180 St. Paul

employees left to join Platinum Holdings' consolidated operations, including

---

[68]     Pet. Mem. at 7.  It is unclear from the context whether Scandinavian
Re uses the term "Platinum" as they defined it, *i.e.*, meaning Platinum Holdings
and Platinum Bda, or to mean Platinum Holdings' consolidated operations, or
Platinum Holdings alone.

[69]     Smillie Aff. ¶ 5.  Smillie never states which Platinum entity pays the
administration fee.

[70]     *See id.* ¶ 7; Pet Mem. at 7.  Again, it is unclear whether the parties are
using the term "Platinum" to mean Platinum Holdings and Platinum Bda, or to
mean Platinum Holdings' consolidated operations, or to mean Platinum Holdings
alone.

[71]     *See* Smillie Aff. ¶ 7.

[72]     *See id.*

18

Platinum Bda.[73]  Elizabeth Mitchell, who was instrumental in negotiating the

Scandinavian Re Agreement and was a pivotal witness in the Scandinavian Re

arbitration, left St. Paul to join Platinum US.[74]  During her testimony in the

Scandinavian Re Arbitration, Mitchell discussed the relationship between The St.

Paul Companies and Platinum Holdings.[75]

## III.  APPLICABLE LAW

### A.  Confirmation of an Arbitration Award Under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards

The Convention on the Recognition and Enforcement of Foreign

Arbitral Awards (the "Convention") applies to arbitration proceedings that arise

out of commercial legal relationships where at least one foreign party is

involved.[76]  Under the Convention:

---

[73]     *See id.* ¶ 9; Pet. Mem. at 7; S-1 Excerpts at 3 (noting that after the IPO, Platinum Holdings' consolidated operations "expect[ed] to employ approximately 180 employees previously employed by St. Paul").

[74]     *See* 6/15/09 Transcript of H. Elizabeth Mitchell's Testimony ("Mitchell Tr.") at 161:15-18, 164:13-15, Ex. 10 to Finnegan Decl.; Pet. Mem. at 20; 6/2/09 Finnegan Email (attaching a calendar and a chart estimating that Mitchell's testimony would take longer than any other witness).

[75]     *See* Mitchell Tr. at 686:8-687:9.

[76]     *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (stating that awards are "'subject to the Convention not because made abroad, but because made . . . involving parties domiciled or having their principal place of business outside the enforcing jurisdiction.'" (quoting

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.[77]

Section V of the Convention states that a court may refuse to confirm a foreign award if it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."[78] Accordingly, the Convention permits "a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the [Federal Arbitration Act ("FAA")], to a motion to set aside or vacate that arbitral award."[79]

## B. Vacature of an Arbitration Award Under the FAA

Under the FAA, the party challenging an arbitral award has the

---

*Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983)).

[77]   9 U.S.C. § 207.

[78]   21 U.S.T. 2517, art. V(1)(e).

[79]   *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 21. *Accord Zeiler v. Deitsch*, 500 F.3d 157, 166 n.6 (2d Cir. 2007) (acknowledging the district court's "double role, both as a confirmation-and-enforcement tribunal of non-domestic arbitration awards under the Convention, and as a competent authority of the country in which . . . that award was made, authorized under Chapter 1 of the FAA to vacate arbitration awards entered in the United States" (citation and quotation marks omitted) (alteration in original)).

burden of proving the existence of grounds to vacate.[80]  Section 10(a)(2) of the

FAA allows a court to vacate an arbitration award "where there was evident

partiality or corruption in the arbitrators, or either of them."[81]  In *Morelite*

*Construction Corp. v. New York City District Carpenters Benefit Funds,* the

Second Circuit held "that 'evident partiality' . . . will be found where a reasonable

person would have to conclude that an arbitrator was partial to one party to the

arbitration."[82]  Under the *Morelite* standard, the party moving to vacate an

arbitration award must show more than an appearance of bias, but proof of actual

bias is not required.[83]

      The Second Circuit has "'not been quick to set aside the results of an

arbitration because of an arbitrator's alleged failure to disclose information'" and

there is no *per se* rule requiring vacatur of an award whenever an undisclosed

---

[80]     *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.").

[81]     9 U.S.C. § 10.

[82]     748 F.2d 79, 84 (2d Cir. 1984).

[83]     *See Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (citing *Morelite*, 748 F.2d at 84). *See also Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 147 (1968) (holding that a party seeking to vacate an arbitration award on the ground of evident partiality need not demonstrate that the arbitrator "was actually guilty of fraud or bias in deciding th[e] case").

relationship is discovered.[84]  This is because "'a principal attraction of arbitration is the expertise of those who decide the controversy,' that '[e]xpertise in an industry is accompanied by exposure . . . to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw.'"[85] However, "[a]n arbitrator who knows of a material relationship with a party and fails to disclose it meets *Morelite*'s 'evident partiality' standard."[86]  Additionally, "arbitrators must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists."[87]  Accordingly, when "an arbitrator has reason to believe that a nontrivial conflict *might* exist, he must (1) investigate the conflict (which may reveal information that must be disclosed . . . ) or (2) disclose his reason for believing there might be a conflict and his intention not to investigate."[88]

---

[84]     *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28, 30 (2d Cir. 2004) (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 700 (2d Cir. 1978)).

[85]     *Id.* (quoting *Andros Compania Maritma, S.A.*, 579 F.2d at 701).

[86]     *Applied Indus. Materials Corp.*, 492 F.3d at 137.

[87]     *Id.* at 138.

[88]     *Id* (emphasis supplied).

## C.    Statute of Limitations

Under section 12 of title 9 of the United States Code, a party wishing to "vacate, modify, or correct" an arbitration award must serve notice of the motion on "the adverse party or his attorney within three months after the award is filed or delivered."[89]  If the adverse party is not a resident of the district in which the award was made, "then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court."[90]  The phrase "in like manner as other process of the court" refers to Rule 4 of the Federal Rules of Civil Procedure.[91] Rule 4 states that to serve process, "[a] summons must be served with a copy of the complaint."

---

[89]    9 U.S.C. § 12.

[90]    *Id.*

[91]    *See Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1277 (2d Cir. 1971) (holding that "[t]he phrase 'in like manner as other process of the court' . . . refers to Fed.R.Civ.P. 4 on the accomplishment of appropriate service" in the context of section 9 of title 9 of the United States Code — the provision for confirming an arbitration award); *Matter of the Arbitration Between InterCarbon Bermuda, LTD and Caltex Trading and Transp. Corp.* ("*InterCarbon*"), 146 F.R.D. 64, 67 (S.D.N.Y. 1993) (concluding that the phrase "in like manner as other process of the court" refers to Rule 4 in the context of section 12 of title 9 of the United States Code — the provision for vacating an arbitration award).

## IV.   DISCUSSION

Scandinavian Re is a Bermuda domiciled company[92] and the

Scandinavian Re Agreement constitutes a commercial legal relationship between

Scandinavian Re and St. Paul.  Accordingly, the Convention applies to the

Scandinavian Re Award[93] and the Scandinavian Re Award can be vacated under

the Convention if it can be vacated under the FAA.[94]

### A.   Statute of Limitations

St. Paul argues that Scandinavian Re's Petition is time barred because

Scandinavian Re failed to serve a summons on St. Paul prior to the expiration of

the three-month statute of limitations.[95]  The facts regarding service of the Petition

are undisputed.  The parties received the Scandinavian Re Award by email on

---

[92]   *See* Pet. Mem. at 2; Opp. Mem. at 9 n.1.

[93]   *See Zeiler*, 500 F.3d at 164 (applying the Convention when "[s]ome of the assets that were the subject of the arbitration [were] located in Israel, and some of the parties reside there").

[94]   *See Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 ("The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.").

[95]   *See* Opp. Mem. at 7-9.

24

August 19, 2009.[96] On November 16, 2009, St. Paul's counsel agreed to accept service of the Petition on St. Paul's behalf.[97] That same day, Scandinavian Re served the Petition, its memorandum of law, and all supporting affidavits on St. Paul's counsel.[98] Scandinavian Re did not serve a summons.[99]

Scandinavian Re argues it did not need to serve a summons along with its Petition. *First*, Scandinavian Re alleges that prior to filing the Petition, it confirmed with the clerk's office for the Southern District of New York that a summons is never issued with a petition.[100] *Second*, Scandinavian Re points to *Homes Ins. Co. v. RHA/Penn. Nursing Home, Inc.* where the court rejected the argument that a petition to confirm an arbitration award should be dismissed

---

[96]    *See* Raim Aff. ¶ 5.

[97]    *See* 11/16/09 Email from Langford (St. Paul) to Rosenblum and Chasnoff (Scandinavian Re), Ex. 7 to Finnegan Decl. (stating that her law firm was "authorized to accept service on behalf of Travelers"); 11/16/09 Email from Rosenblum to Langford and Chasnoff, Ex. 7 to Finnegan Decl. (confirming his understanding that Langford "agreed to accept service for all the St. Paul/Travelers entities that participated in the [Scandinavian Re A]rbitration as petitioners").

[98]    *See* Declaration of Joseph L. Sorkin, Counsel for Scandinavian Re, in Support of Petitioner's Memorandum of Law in Opposition to Respondent's Cross-Motion to Confirm and Reply in Support of Petition to Vacate Arbitration Award ("Sorkin Decl.") ¶ 2.

[99]    *See* 11/23/09 Email from Nelson to Finnegan, Ex. 8 to Finnegan Decl. (stating Scandinavian Re's view that "a summons . . . is unnecessary").

[100]    *See* Sorkin Decl. ¶ 5.

25

because the petitioner failed to serve a summons.[101]  The court reasoned that

section 9 of title 9 of the United States Code,[102] only contemplated service of

"'notice of the application' to confirm the [arbitration] award . . . , not a

summons."[103]  *Homes Ins. Co.* is persuasive.  Sections 9 and 12 appear to refer to

Rule 4 only to indicate the *manner* of service, not to indicate which documents

must be served.  Scandinavian Re's service of its Petition was sufficient to give St.

Paul notice of its petition to vacate the Scandinavian Re Award.  Such service is

sufficient to comply with Section 12.

Even if Scandinavian Re's failure to serve the summons resulted in

defective service, such a defect can be excused by considerations of fairness in

cases that result from arbitration proceedings.[104]  This is because, when parties

---

[101]    113 F. Supp. 2d 633, 635 n.10 (S.D.N.Y. 2000).

[102]    Section 9 is the provision governing confirmation of arbitration
awards.  The requirements for serving notice of a motion to confirm the arbitration
award are the same as Section 12's requirements for serving notice of a motion to
vacate the arbitration award.

[103]    *Homes Ins. Co.*, 113 F. Supp. 2d at 635 n.10.

[104]    *See InterCarbon*, 146 F.R.D. at 68 ("Defects in service of process
may . . . be excused where considerations of fairness so require, at least in cases
that arise pursuant to arbitration proceedings.") (citing *Merrill Lynch, Pierce,
Fenner & Smith v. Lecopulos*, 553 F.2d 842, 844-45 (2d Cir. 1977) and *Victory
Transp., Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d
354, 363, 364 (2d Cir. 1964)).

26

enter into an agreement to arbitrate in a particular forum, they consent to personal

jurisdiction in the courts of that forum.[105]  Therefore, the only purpose of process

in cases resulting from arbitration proceedings within a court's jurisdiction is to

alert the opposing party that a court action has commenced, not to establish

personal jurisdiction over the opposing party.[106]

Here, the arbitration provision in the Scandinavian Re Agreement

states that "[u]nless the panel [of arbitrators] agrees otherwise, arbitration will take

place in New York, New York" and that "[j]udgement upon the award may be

entered in any court having jurisdiction thereof."[107]  Accordingly, by agreeing to

arbitrate in New York City and agreeing that the award could be enforced by

---

[105]     *See Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 979 (2d Cir.
1996) (stating that when a party agrees "'to arbitrate in [a state], where the
[Federal Arbitration Act] makes such agreements specifically enforceable, [that
party] must be deemed to have consented to the jurisdiction of the court that could
compel the arbitration proceeding in [that state].  To hold otherwise would be to
render the arbitration clause a nullity.'" (quoting *Victory Transp.* 336 F.2d at 363)
(alterations in original)); *Lecopulos*, 553 F.2d at 844 ("Merrill Lynch argues that
the agreement to resolve disputes by arbitration in New York constituted consent
to personal jurisdiction in New York.  Merrill Lynch is correct.").

[106]     *See Victory Transp.* 336 F.2d at 363 (holding that because "the
appellant [had] consented beforehand to the jurisdiction of the district court" by
agreeing to arbitrate within its jurisdiction, "the sole function of
process . . . was. . . to notify the appellant that proceedings had commenced").

[107]     Scandinavian Re Agreement at 12.

courts having jurisdiction over New York City, Scandinavian Re and St. Paul

consented to personal jurisdiction in this Court. Thus service was only necessary

to alert St. Paul of the Petition to Vacate. Scandinavian Re's failure to serve a

summons can be excused in the interests of justice because Scandinavian Re

provided actual notice of the Petition to St. Paul thereby effectuating the sole

purpose of service.[108]

### B.    Evident Partiality

Scandinavian Re argues that this case is governed by *Applied*

*Industrial Materials Corp. v. Olvalar Makine Ticaret Ve Sanayli A.S.* ("*Applied*

*Industrial*"). In *Applied Industrial* the Second Circuit determined that "an

arbitrator who knows of a material relationship with a party and fails to disclose it

meets *Morelite*'s 'evident partiality' standard: A reasonable person would have to

conclude that an arbitrator who failed to disclose under such circumstances was

---

[108]    *See Lecopulos*, 553 F.2d at 845 (holding that filing a lawsuit and then
moving for a stay pending arbitration constitutes adequate service of a demand for
arbitration when "no unfairness result[ed] from giving effect to the notice
[respondent and his counsel] actually received"); *Matter of the Arbitration
Between Lauritzen Kosan Tankers and Chem. Trading, Inc.*, 903 F. Supp. 635, 637
(S.D.N.Y. 1995) (denying respondent's motion to dismiss a petition to confirm an
arbitration award despite defects in service of process when petitioner "actually
received notice through its attorney and no injustice results from giving effect to
that notice").

partial to one side."[109]  St. Paul argues that *Applied Industrial* is inapplicable to

this case because it addresses an undisclosed relationship between an arbitrator

and a party to the arbitration,[110] whereas this case addresses the undisclosed

relationships "between two arbitrators and/or . . . between an arbitrator and a non-

party."[111]  St. Paul's attempt to distinguish *Applied Industrial* is unconvincing.  A

reasonable person concludes that an arbitrator is partial to one side because the

undisclosed relationship is material, not because the material relationship is with a

party.  In other words, the significance of the undisclosed relationship is the

decisive factor, not which people the relationship involves.

        St. Paul does not (and cannot) argue that either Dassenko or Gentile

disclosed their service as arbitrators in the Platinum Bda Arbitration or that they

had heard testimony from Hedges less than three months prior to his testimony in

the Scandinavian Re Arbitration.[112]  Dassenko and Gentile were clearly aware of

---

[109]    492 F.3d at 137.

[110]    *See id.* at 135.

[111]    Opp. Mem. at 16 n.17.  St. Paul fails to mention the undisclosed
relationship between the two arbitrators and a witness.

[112]    St. Paul does argue that Gentile's disclosure that he "met [Hedges] a
few times in the past, mainly in Bermuda" was sufficient to make Scandinavian
Re's "argument that Dassenko's and Gentile's relationship with Hedges was
undisclosed dead on arrival." Opp. Mem. at 22.  However, Gentile's disclosure
was not sufficient to disclose that he had evaluated Hedges's testimony in a

their involvement in the Platinum Bda Arbitration and Hedges's appearance as a witness.[113] Accordingly, the only issue is whether the undisclosed relationships involved in the Platinum Bda Arbitration were material.

St. Paul argues that the undisclosed relationships were trivial because (1) neither Dassenko nor Gentile had any financial (or other) interest in the outcome of the arbitration; and (2) neither Dassenko nor Gentile had any direct relationship with St. Paul.[114] St. Paul also concludes that the contemporaneous timing of the Scandinavian Re Arbitration and the Platinum Bda Arbitration is

---

different Arbitration less than three months before. If anything, Gentile's disclosure could serve to falsely assure Scandinavian Re that Gentile did not have any recent significant encounters with Hedges.

[113]   Because Platinum was not listed among St. Paul's affiliated companies on the umpire questionnaire, it is possible that Dassenko and Gentile were initially unaware that a relationship existed between The St. Paul Companies' consolidated operations and Platinum Holdings' consolidated operations. However, both arbitrators were aware of some affiliation by no later than the September 23, 2008 Platinum Bda organizational meeting where Gentile referred to "Platinum's predecessor, St. Paul Re." Platinum Bda Org. Mtg. Tr. at 8:19-23. Similarly, Dassenko and Gentile may not initially have known that Hedges would appear as a witness in both the Scandinavian Re Arbitration and the Platinum Bda Arbitration. However, Dassenko and Gentile knew that Hedges potentially would be a common witness by no later than March 31, 2009, the day that Hedges's deposition testimony was played in the Platinum Bda Arbitration, because St. Paul and Scandinavian Re had included Hedges on their preliminary witness lists exchanged on March 27, 2009.

[114]   *See* Opp. Mem. at 16-17.

irrelevant because Scandinavian Re "does not allege the existence of a relationship

between the Arbitrators and a party."[115]  A financial interest in the outcome of the

arbitration or a direct relationship with a party are relevant considerations when

determining whether a relationship is material to the arbitration at issue.[116]

However, the absence of these factors is not dispositive as to whether a

relationship is material — all of the circumstances must be considered, including

the timing of the arbitrators' relationships with each other, and with witnesses to

the arbitration.[117]

        In this case, the Scandinavian Re Arbitration and the Platinum Bda

Arbitration were presided over by two common arbitrators, overlapped in time,

---

[115]      *See* Respondents' Sur-Reply to Petitioner's Opposition to
Respondents' Cross-Petition to Confirm and Reply in Support of Petition to
Vacate Arbitration Award at 3 n.2.

[116]      *See Applied Indus. Materials Corp.*, 492 F.3d at 139 (holding that a
material relationship existed when a subsidiary of the arbitrator's multi-billion
dollar company entered into a contract worth approximately $275,000 with a
company that purchased one of the parties to the arbitration); *Morelite*, 748 F.2d at
84 (holding that a material relationship existed when the arbitrator's father was
"the President of an international labor union, a district union of which [was] a
party to the arbitration").

[117]      *Applied Indus. Materials Corp.*, 492 F.3d at 137 ("[A]n arbitrator is
disqualified only when a reasonable person, *considering all of the circumstances*,
would have to conclude that an arbitrator was partial to one side." (quotation
marks omitted) (emphasis omitted and emphasis supplied)).

31

shared similar issues,[118] involved related parties,[119] included Hedges as a common

witness that supported interpreting the Platinum Bda Agreement *as written* but

interpreting the Scandinavian Re Agreement in light of Scandinavian Re's *intent*

at the time it entered into the agreement. Additionally, Mitchell was employed by

Platinum US at the time she appeared as a witness in the Scandinavian Re

Arbitration.[120] By participating in both the Scandinavian Re Arbitration and the

Platinum Bda Arbitration, Dassenko and Gentile placed themselves in a position

where they could receive *ex parte* information about the kind of reinsurance

business at issue in the Scandinavian Re Arbitration, be influenced by recent

---

[118]     Although the issues involved in the Scandinavian Re Arbitration and
the Platinum Bda Arbitration were not identical, both arbitrations required the
arbitrators to (1) consider whether a finite retrocessional agreement should be
enforced according to the express terms of the agreement or whether the
agreement should be interpreted in light of the parties' intentions at the formation
of the agreement and (2) interpret contract language regarding the creation of
experience accounts.

[119]     Even if St. Paul has no direct corporate interrelatedness with Platinum
Bda, a substantial relationship between The St. Paul Companies' consolidated
operations and Platinum Holdings' consolidated operations was clearly revealed
during both the Scandinavian Re Arbitration and the Platinum Bda Arbitration.
*See* Scandinavian Re Arb. Tr. at 686:8-687:9; *PMA Capital Ins. Co.*, 659 F. Supp.
2d at 634 (explaining that an issue in the Platinum Bda Arbitration was whether
Platinum Bda could carry forward losses incurred under the contract written by St.
Paul Re). A reasonable person would consider this relationship between the
parties a factor weighing in favor of disclosure.

[120]     *See* Mitchell Tr. at 161:15-18.

credibility determinations they made as a result of Hedges's testimony in the

Platinum Bda Arbitration, and influence each other's thinking on issues relevant to

the Scandinavian Re Arbitration. By failing to disclose their participation in the

Platinum Bda arbitration, Dassenko and Gentile deprived Scandinavian Re of an

opportunity to object to their service on both arbitration panels[121] and/or adjust

their arbitration strategy.[122] Dassenko and Gentile's failure to disclose their

participation in the Platinum Bda Arbitration and their recent consideration of

---

[121]     There is some evidence other than Scandinavian Re's hindsight
assertion that suggests Scandinavian Re would have objected to Dassenko and
Gentile's concurrent service on the Platinum Bda Arbitration. On June 25, 2009,
Gentile disclosed that he had been appointed to serve as an umpire in an
arbitration involving The St. Paul Companies. *See* Scandinavian Re Arb. Tr. at
2109:22-2110:19. In response to this disclosure Scandinavian Re's counsel asked
whether that matter "involves any kind of casualty business that's similar to this
[arbitration]" and Gentile assured Scandinavian Re "that it's not an issue that has
anything to do with . . . any similar type of business whatsoever." *See*
Scandinavian Re Arb. Tr. at 2110:20-2111:18. Because the similarity of the issues
involved was clearly a factor Scandinavian Re evaluated when determining
whether to object to an arbitrator's concurrent service on an arbitration involving a
St. Paul affiliated company, it is reasonable to conclude that Scandinavian Re
would have objected to Dassenko and Gentile's concurrent service in the Platinum
Bda Arbitration.

[122]     *See* Chasnoff Decl. ¶ 10 (stating that if he had know about Dassenko
and Gentile's concurrent service in the Platinum Bda Arbitration and Hedges's
appearance as a witness in that arbitration it "likely would have affected how I
presented the evidence and the issues in briefings and at hearings" and that such
knowledge "would have affected how I prepared for and presented the testimony
of certain witnesses, including Bart Hedges").

33

Hedges's testimony is not excused even if they believed in good faith that they would not be influenced by the information they learned during the course of the Platinum Bda Arbitration.[123]

Taken together, these factors indicate that Dassenko and Gentile's simultaneous service as arbitrators in the Scandinavian Re Arbitration and the Platinum Bda Arbitration constituted a material conflict of interest. Support for this conclusion is strengthened by a comparison of the relationships involved in the Platinum Bda Arbitration with other less significant or temporally remote relationships that Dassenko and Gentile considered important enough to disclose.[124] Dassenko and Gentile's failure to disclose their participation in the

---

[123]     *See Applied Industrial*, 492 F.3d at 138 ("It is possible that the arbitrator believed in good faith that because the potential transaction involved a subsidiary, would generate revenue that was small in light of the size of his business, and was far removed from his daily concerns, nothing had occurred that would affect his ability to be fair and impartial. However, . . . subjective good faith is not the test.").

[124]     *See, e.g.*, Scandinavian Re Arb. Tr. 2109:7-21 (Gentile disclosing, even though he thought Rosen had already disclosed, that he and Rosen "are on a panel together not involving either of the parties, not involving either of the law firms, both as party appointed [arbitrators]"); *id.* at 3604:6-21 (Dassenko questioning a witness to determine whether in 1982 through 1985 he may have worked on contracts that the witness reviewed and approved); *id.* at 2149:25-2150:20 (Gentile disclosing that he knew a witness because he and the witness met 15 or 20 years ago, worked in a similar industry, knew each other from ARIAS, had dinner "once or twice," and the witness had once served as an expert witness for the other side in an arbitration where his company was a party); Org. Mtg. Tr.

Platinum Bda Arbitration meets the *Morelite* standard for evident partiality

because the undisclosed relationships involved in the Platinum Bda Arbitration

collectively were material and Dassenko and Gentile had actual knowledge of

those relationships.[125]

## V.   CONCLUSION

For the reasons set forth above, Scandinavian Re's petition to vacate

---

at 13:13-14:10 (Gentile disclosing that "a number of years ago" he served as a fact witness in an arbitration where Dassenko acted as a party appointed arbitrator and that he knew Dassenko through ARIAS, industry meetings, and "mutual employments"). *See also New Regency Prod. Inc. v. Nippon Herald Films, Inc.* 501 F.3d 1101, 1110 (9th Cir. 2007) (applying *Applied Industrial* and concluding that a party may be misled into believing that nontrivial conflicts of interest do not exist when a party reasonably could have expected the conflict to be disclosed based on the arbitrator's prior disclosures in the arbitration).

[125]    *See Applied Industrial Materials Corp.*, 492 F.3d at 138 (stating that "the presence of actual knowledge of a conflict can be dispositive of the evident partiality test").

Scandinavian Re asserts that Dassenko and Gentile "affirmatively misled" Scandinavian Re and "l[ied] in [the Platinum Bda Arbitration] about having never served in a matter involving Platinum's Predecessor St. Paul Re." *See* Petitioner's Memorandum of Law in Opposition to Respondents' Cross-Petition to Confirm and Reply in Support of Petition to Vacate Arbitration Award at 3, 9. Whether Dassenko and Gentile purposely concealed their involvement in the Platinum Bda Arbitration is unclear. However, I need not decide whether Dessanko and Gentile acted maliciously in order to vacate the Scandinavian Re Award. *See Applied Industrial*, 492 F.3d at 138 (holding that an arbitrator's failure to either investigate a potential conflict of interest or disclose his intention not to investigate the conflict of interest was not excused even if the arbitrator acted in good faith).

35

the arbitration award is granted and St. Paul's cross-petition to confirm the

arbitration award is denied.  This matter is remanded for arbitration in front of a

new panel of arbitrators selected in accordance with the Scandinavian Re

Agreement.  The new panel of arbitrators shall not include Dassenko, Gentile, or

Rosen.  St. Paul is ordered to return and/or release all funds paid or posted by

Scandinavian Re in response to orders made by the arbitration panel during the

Scandinavian Re Arbitration, return funds drawn by St. Paul from letters of credit

posted by Scandinavian Re, and take any other steps necessary to return both

parties to the positions that they were in as of September 26, 2007, the day St. Paul

demanded arbitration.  St. Paul must refrain from drawing on any collateral posted

by Scandinavian Re until a further order of this Court or an order from the new

panel of arbitrators permits them to do so.  Any interim orders of the original

arbitration panel are set aside.  The Clerk of the Court is directed to close these

motions and this case (09 Civ. 9531).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 23, 2010

36

## - Appearances -

**For Petitioner:**

Mitchell P. Hurley, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

**For Respondents:**

John F. Finnegan, Esq.
Chadbourne and Parke LLP
30 Rockefeller Plaza
New York, NY 10012
(212) 408-5180